Wayne K. Caldwell (#9466)
Aaron K. Bergman (#13147)
BEARNSON & CALDWELL, LLC
*Attorneys for Plaintiff, Robert Hampton*
399 North Main, Suite 270
Logan, Utah 84321
Telephone: (435)752-6300
Facsimile: (435)752-6301
Email: wcaldwell@bearnsonlaw.com
Email: abergman@bearnsonlaw.com
*For emails, please cc: bjensen@bearnsonlaw.com*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| TIANBIAO LIU,<br><br>Plaintiff,<br><br>v.<br><br>UTAH STATE UNIVERSITY, a Utah Governmental Entity; LANCE SEEFELDT, an individual; LAURENS SMITH, an individual; REBECCA SEAMONS, an individual; and JENNIFER DAMELIO, an individual,<br><br>Defendants. | **COMPLAINT**<br><br>**- WITH -**<br><br>**JURY DEMAND**<br><br>Honorable Judge: Daphne A. Oberg<br><br>Appointed Magistrate:<br><br>Case No. 1:24-cv-00087-DAO |

COMES NOW Plaintiff, TIANBIAO LIU, an individual, by and through his attorney Aaron K. Bergman and the law firm Bearnson & Caldwell, LLC, and hereby complains against Defendant, UTAH STATE UNIVERSITY, a Utah Governmental Entity; LANCE SEEFELDT, an individual; LAURENS SMITH, an individual; REBECCA SEAMONS, an individual; and JENNIFER DAMELIO, an individual, as follows:

## NATURE OF ACTION

This action seeks injunctive and monetary redress for Utah State University's violations of rights secured to TIANBIO LIU by the United States Constitution and Title IX of the Educational Amendments of 1972, as amended. Dr. Liu also brings a breach of contract cause of action, in the alternative.

## PARTIES

1.      TIANBIAO LIU (hereinafter "Dr. Liu" or "Plaintiff") is an individual residing in the State of Utah, County of Cache. Dr. Liu is a Tenured Associate Professor of the Utah State University within the College of Science, Chemistry and Biochemistry Department.

2.      UTAH STATE UNIVERSITY is a Utah Governmental Entity, and operates numerous higher-education facilities including the College of Science located in the State of Utah, County of Cache.

3.      LANCE SEEFELDT (hereinafter "Defendant Seefeldt" or "Defendant"), is an individual residing in the State of Utah, County of Cache. Defendant Seefeldt is the Department Head of the Chemistry and Biochemistry Department of the Utah State University College of Science.

4.      LAURENS SMITH (hereinafter "Defendant Smith" or "Defendant"), is an individual residing in the State of Utah, County of Cache. Defendant Smith is the Provost and Chief Academic Officer of Utah State University.

5.      JENNIFER DAMELIO (hereinafter "Defendant Damelio" or "Defendant") is an individual residing in the State of Utah, County of Cache. Defendant Damelio is a Title IX Coordinator and Investigator within the Office of Equity at Utah State University.

6.      REBECCA SEAMONS (hereinafter "Defendant Seamons" or "Defendant") is an individual residing in the State of Utah, County of Cache. Defendant Seamons is a Human Resource representative and investigator at Utah State University.

<u>**JURISDICTION & VENUE**</u>

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal subject matter), and 28 U.S.C. §§ 2201 and 2202 (declaratory relief subject matter).

8.      Both parties reside and / or centrally operated within the County of Cache, and therefore venue in this Court is proper. See 28 U.S.C. §1391.

9.      There is no requirement for Dr. Liu to exhaust one (1) or more administrative remedies prior to bringing the claims set forth herein.

<u>**GENERAL ALLEGATIONS**</u>

10.     Since 2015, Dr. Liu has been a tenured Associate Professor with Utah State University in the College of Science, department of Chemistry and Biochemistry.

11.     As part of his duties as a professor, Dr. Liu teaches, conducts research, and leads a "research group" comprised of students seeking to obtain a doctorate degree in Chemistry and/or Biochemistry.

12.     Consistent with his duties as an Associate Professor, Dr. Liu distributes to each doctorate student the specific expectations and standards to which the students are held as members of his research group, and provides copies of the same to the Department Head of the Chemistry and Biochemistry department.

13.     The commitments made by doctoral students is significant. Typically, the doctoral program will take a minimum of five (5) years to complete.

14.     Doctoral students will be expected to work at least forty (40) hours in the lab and on group research projects every month. First authorship in peer-reviewed publications is required for graduation, and throughout their pursuit of a doctorate degree, students will rely heavily on the professional judgment of their doctorate advisor, Dr. Liu.

15.     When a student graduates, or whether a student is eligible to graduate, is not up to Dr. Liu alone. Rather, there is a doctoral committee established for each student, of whom the student's advising professor is but one (1) of the members. Whether Dr. Liu recommends any student for graduation is subject to his professional judgment.

16.     In or about August of 2018, Dr. Liu's own past doctorate advisor, who still resided in China, recommended to Dr. Liu that he help a prospective student (hereinafter referred to as "STUDENT") pursue her doctorate degree at Utah State University in Chemistry and Biochemistry. Dr. Liu obliged, and invited STUDENT to enroll.

17.     STUDENT began her education at USU in the Spring of 2019.

18.     STUDENT proved to be a good student. She was smart, worked hard, and it was clear to Dr. Liu that STUDENT wanted to excel in the doctorate program. However, STUDENT was at times obstinate towards authority figures, refusing to engage in certain research projects without repeated requests being made by Dr. Liu. STUDENT would also struggle with tasks that according to her past educational experience, she should have already been able to proficiently perform.

19.     Dr. Liu did his best to help STUDENT achieve success in the doctorate program, and as a result STUDENT did achieve great successes, including first authorship as well as numerous co-authorships in well known peer-reviewed scientific publications.

20.     In October of 2022, STUDENT approached Dr. Liu and requested to be recommended for early graduation. Dr. Liu informed STUDENT that unfortunately, in his professional judgment, STUDENT was not an appropriate candidate for early graduation.

21.     STUDENT was insistent, demanding that Dr. Liu allow her to graduate early, citing to her accomplishments and telling Dr. Liu that he was making a mistake.

22.     Dr. Liu informed STUDENT that he was not going to recommend her for early graduation, and left the room.

23.     On November 4, 2022, STUDENT again approached Dr. Liu and requested again to be recommended for early graduation. Dr. Liu again informed STUDENT that he did not believe she was an appropriate candidate for early graduation, but informed STUDENT that if she disagreed, she could take the matter up with the Department Head, Defendant Seefeldt, as was her right as a graduate student.

24.     On November 8, 2022, STUDENT met with the department's Graduate Program Coordinator, Dr. Cindy Weatbrook. STUDENT proceeded to falsely report to Dr. Weatbrook that Dr. Liu had previously agreed to allow STUDENT to graduate in the Spring of 2023. STUDENT also falsely reported to Dr. Weatbrook that Dr. Liu had refused to extend STUDENT's visa unless she agreed to stay a student at the University until the Spring of 2024. In reality, STUDENT's visa was never discussed with Dr. Liu.

25.     Ms. Weatbrook proceeded to advise STUDENT that she should file a Title IX complaint against Dr. Liu for "Sexual Discrimination." Dr. Weatbrook, on the basis of these same allegations, submitted her own Title IX incident report of "Sexual Discrimination" against Dr. Liu

to the Utah State University's Office of Equity. STUDENT also did so, filing a report of Sexual Misconduct, Sexual Discrimination, and Retaliation.

26.     One day after making the above false allegations to Dr. Weatbrook and the Office of Equity, STUDENT was advised that Dr. Liu had nothing to do with the extension of her visa.

27.     On November 10, 2022, the STUDENT published a letter on an online Chinese-based discussion board known as "WeChat." The letter implied that STUDENT was going to attempt suicide, and tacitly blamed Dr. Liu for her decision.

28.     On November 16, 2022 USU and Defendant Seefeldt removed Dr. Liu from his teaching position and advised Dr. Liu that the Office of Equity would be conducting a Title IX investigation. Yet, Defendant Seefeldt and USU also informed Dr. Liu that he was strictly forbidden from discussing or speaking with others affiliated with USU on any and all topics, except the Title IX Investigator; was not allowed to use his USU email account or telephone number without prior approval by Dr. Seefeldt; was prohibited from entering the campus; and was removed from his responsibilities and privileges as a Tenured Associate Professor of the Utah State University.

29.     If Dr. Liu violated any of the above prohibitions, warned Defendant Seefeldt and USU, Dr. Liu would be subject to discipline and it would be construed as Retaliation.

30.     On December 1, 2022, Defendant Damelio served Dr. Liu with a Formal Complaint against Dr. Liu, wherein STUDENT as the complainant alleged Dr. Liu had engaged in Discrimination against STUDENT. The allegations raised by STUDENT were patently not indicative of Discrimination.

31.     On December 1, 2022, Defendant Damelio served Dr. Liu with a Formal Complaint against Dr. Liu, wherein STUDENT as the complainant alleged that Dr. Liu had engaged in Sexual Misconduct against STUDENT. The allegations raised by STUDENT were patently not indicative of Sexual Misconduct.

32.     USU and Defendant Seefeldt responded to STUDENT's allegations by immediately removing Dr. Liu from his teaching position; prohibiting Dr. Liu from entering the campus; and prohibiting Dr. Liu from collecting any evidence from potential witnesses affiliated with USU who might support his defense against STUDENT's allegations. If Dr. Liu did not obey these restrictions, USU and Defendant Seefeldt threatened, Dr. Liu would be disciplined including up to termination of his employment.

33.     On the other hand, USU and Dr. Seefeldt unilaterally transferred STUDENT to a new research group; removed Dr. Liu from STUDENT"s graduate committee; and informed STUDENT that she would indeed be graduating early, as she had requested.

34.     As the investigation proceeded, Dr. Liu informed Defendant Damelio that he would like to bring a formal complaint of Retaliation against Defendant Seefeldt and STUDENT for speaking with prospective witnesses and collecting information on campus from students relative to the STUDENT's formal complaints. Defendant Damelio informed Dr. Liu that unlike him, STUDENT could talk to witnesses, be on campus, and gather evidence related to her formal complaints. Dr. Liu as a respondent, however, could not. To do otherwise, Defendant Damelio threatened, would subject Dr. Liu to discipline.

35.     Defendant USU and Defendant Damelio refused to recognize or pursue Dr. Liu's proposed retaliation charge.

36.     As the investigation proceeded, Defendant Damelio repeatedly showed bias towards Dr. Liu. For example, Defendant Damelio informed Dr. Liu that an extension to the Title IX grievance process had been granted, but refused to tell Dr. Liu why. After Dr. Liu made several requests for why an extension had been granted, Defendant Damelio relented, admitting that after STUDENT had been permitted to graduate early, she had asked to be removed from the Title IX grievance process and had asked USU to dismiss her claims against Dr. Liu.

37.     After informing Dr. Liu of the foregoing, USU and Defendant Damelio affirmatively dismissed STUDENT's Discrimination formal complaint, on the merits, concluding that even after an investigation none of the facts proven, even if true, could amount to Discrimination.

38.     Simultaneous with dismissing STUDENT's Discrimination formal complaint on the merits, however, USU and Defendant Damelio informed Dr. Liu that they (not STUDENT) were amending STUDENT's Sexual Misconduct formal complaint to include the allegations contained in the STUDENT's now dismissed Discrimination formal complaint. Defendant Damelio also consolidated both of the cases, but it was unclear which evidence, and how amongst the hundreds and hundreds of pages collected by Defendant Damelio, the dismissed Discrimination allegations were relevant to a claim of Sexual Misconduct.

39.     Due to the sheer size of the evidentiary records that Defendant Damelio had compiled, and the confusing fashion in which USU and Defendant Damelio had on one hand deemed allegations incognizable for one claim, but suddenly cognizable for another, Dr. Liu requested a copy of the evidentiary record, as was his right under Title IX.

40.     Defendant Damelio and USU refused and would not provide Dr. Liu with a copy of the record.

41.     Eventually, Defendant Damelio issued a lengthy preliminary report, which evidenced numerous instances of blatant bias ranging from omitting evidence submitted by Dr. Liu; speaking and quoting Dr. Liu condescendingly, mockingly and at times with contempt; and improperly placing evidence that was received by Dr. Liu largely only in the footnotes.

42.     As was his right, Dr. Liu requested a copy of the lengthy preliminary report so that he could create a response, as was his right.

43.     Defendant Damelio and USU refused and would not provide Dr. Liu with a copy of the preliminary report.

44.     In time, Defendant Damelio issued an even lengthier final report, which continued to evidence numerous instances of similar and blatant bias. Again, Dr. Liu as was his right requested a copy of the final report. And again, Defendant Damelio and USU refused.

45.     USU finally lifted Dr. Liu's restrictions, but only in part. He could interact with students in his research group, but was strictly supervised in all communications and interactions with students and others by Defendant Seefeldt or another delegated staff member. During this time, it came to light that Dr. Liu had complained to members of his research group regarding how USU was handling the Title IX Grievance Process, stating that such was unfairly burdensome to himself and the remainder of his research group.

46.     USU made good on its threat, and again removed Dr. Liu from his professorial duties. STUDENT also received word from Defendant Damelio that Dr. Liu was speaking to one or more potential witnesses about the grievance process, and encouraged STUDENT to file a

separate formal complaint for Retaliation. STUDENT did so, and USU Defendant Damelio promptly provided Dr. Liu with notice of USU's intent to pursue the complaint.

47.     In anticipation of scheduling a Title IX Grievance Hearing, USU appointed a "decision-maker" who informed Dr. Liu that a "preliminary" hearing would be held to address what issues would be heard at the forthcoming Title IX hearing, and to inform the parties as to the format of the hearing. The preliminary hearing was scheduled for October 4, 2023.

48.     At the preliminary hearing, and to Dr. Liu's utter shock and confusion, the decision-maker informed Dr. Liu that the primary question to be determined at the Title IX Grievance Hearing was whether Dr. Liu had treated STUDENT differently because of her sex. Dr. Liu, through his advisor, advised the decision-maker that STUDENT's Discrimination formal complaint had previously been dismissed and that the issue at play was one of "Sexual Misconduct" which again, there was no evidence supporting. The decision-maker disagreed, and informed Dr. Liu that the issue to be heard was primarily whether Dr. Liu had treated STUDENT differently because of her sex, and secondarily whether Sexual Misconduct in the form of quid-pro-quo had taken place.

49.     Notwithstanding USU's and Defendant Damelio's blatant misleading of Dr. Liu as to what Title IX violations were actually being pursued against him, on the positive side finally a Title IX Grievance Hearing was scheduled for April 12, 2024. By the time the hearing came, over sixteen (16) months had elapsed from the time that USU and Defendant Seefeldt removed Dr. Liu's privileges as a Tenured Associate Professor at the Utah State University.

50.     Before the Title IX Grievance Hearing could even take place, however, Defendant Smith and USU on February 23, 2024 issued Sanction Proceedings with intent to dismiss Dr. Liu's

employment. Several times, USU's notice of intent expressly refers to Dr. Liu's involvement in the Title IX Grievance process; to Dr. Liu's exercise of his rights under the Title IX Grievance process; and to Dr. Liu's contesting of those allegations. Though the Title IX Hearing had not even taken place, USU and Defendant Smith had condemned Dr. Liu to dismissal stating: "It's improbable that the many witnesses interviewed at different times in different contexts, were all untruthful in the same way so your denials of wrongdoing lack credibility."

51.     At or about this same time, USU and Defendant Smith caused Dr. Liu's professional profile to be taken down from USU's website.

52.     Dr. Liu was trying to prepare and focus his time and resources on the forthcoming Title IX Grievance Hearing, and his Title IX Advisor who was also to represent Dr. Liu in relation to these new sanctions proceedings was in a trial. Dr. Liu asked Defendant Seefeldt and USU for an extension of time to respond to the USU's and Defendant Smith's Sanction Proceedings, which in addition to the allegations which were the subject of STUDENT's and USU's Title IX Formal Complaints, raised additional 'code of conduct' violations.

53.     USU and Defendant Smith refused Dr. Liu's request for an extension.

54.     The Title IX Grievance Hearing began on April 12, 2024, but due to time constraints was scheduled to continue on April 30, 2024.

55.     Before the Title IX Grievance Hearing could be finished, on April 16, 2024 Defendant Seamons conducted an investigation in pursuit of Defendant Smith's and USU's Sanction Proceedings, and in doing so disregarded patently relevant evidence; relied heavily on STUDENT's bald allegations raised in the Title IX Grievance Process; and relied heavily on the biased conclusions of Defendant Damelio while repeatedly referencing Dr. Liu's response to the

Title IX Grievance Process, as well as his speaking with others in purported violation of USU's and Defendant Seefeldt's prohibitions, as a basis to dismiss Dr. Liu.

56.     On April 30, 2024, the Title IX Grievance Hearing was finally completed.

57.     The Hearing Panel for the Title IX Grievance Process issued its preliminary findings, which attest that Dr. Liu did <u>not</u> commit any violations of Title IX, neither in the form of Discrimination, Sexual Misconduct, or Retaliation.

58.     Dr. Liu is still prohibited from entering USU's campus, affiliating with his colleagues, speaking with students, or otherwise engaging in any of the privileges and liberties afforded him as a licensed, Tenured Associate Professor of a public institution of higher education.

### <u>FIRST CAUSE OF ACTION</u>
Violation of Title IX of the Educational Amendments of 1972
An Implied Cause of Action
(Defendant Utah State University)

59.     Plaintiff hereby incorporates by reference each of the preceding paragraphs.

60.     Under Title IX, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

61.     To effectuate 20 U.S.C. § 1681, the Federal departments of the United States Government, upon approval by the President, are empowered to enact rules and regulations which rules and regulations public entities are held to if they wish to continue receiving federal funding. See 20 U.S.C. § 1682. By virtue of such regulation, all higher education universities are required to adopt "grievance procedures that provide for the prompt and equitable resolution of student and

employee complaints alleging any action that would be prohibited by this part and a grievance process that complies with § 106.45 for formal complaints as defined in § 106.30."

62.    Importantly, the grievance procedures exist not only to implement Title IX, but also to ensure that higher educational institutions implement Title IX in a lawful, nondiscriminatory manner. As Title IX sets forth in the governing regulations, a public institution's treatment of a "complainant **or a respondent** in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX." 34 C.F.R. § 106.45(a). (brackets, bold).

63.    Pertinent regulations governing how public institutions must "treat" respondents in response to a formal complaint are set forth below, accompanied by legal citation:

(a)  All provisions, rules, and practices of USU in regards to the grievance process "must apply equally to **both** parties." 34 C.F.R. § 106.45(b). (bold).

(b)  USU must engage in an "**objective evaluation**" of the relevant evidence, "including both inculpatory and exculpatory evidence[.]" 34 C.F.R. § 106.45(b)(1)(ii). (brackets, bold).

(c)  USU must ensure that its Title IX Coordinator / investigator does not have a "bias for or against complainants **or respondents** generally" and that the Title IX Coordinator / investigator receives "training on the **definition of sexual harassment in § 106.30** . . . and how to serve impartially, including by avoiding prejudgment of the facts at issue[.]" 34 C.F.R. § 106.45(b)(1)(iii). (brackets, bold).

(d)  USU must ensure that its Title IX Coordinator / investigator does not "rely on **sex stereotypes** and must promote impartial investigations[.]" 34 C.F.R. § 106.45(b)(1)(iii). (brackets, bold).

(e)  USU must ensure that the respondent is presumed "**not responsible** for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." 34 C.F.R. § 106.45(b)(1)(iv). (bold).

(f)  USU must use "**reasonably prompt time frames** for conclusion of the grievance process" with only "**limited extension of time frames** for good cause

with written notice to the complainant and the respondent of the delay . . . and the reasons for the action." 34 C.F.R. § 106.45(b)(1)(v). (bold).

(g) If the conduct "alleged in the formal complaint would not constitute sexual harassment as defined in § 106.30 even if proved, . . . **then [USU] must dismiss the formal complaint with regard to that conduct** for purposes of sexual harassment under title IX." 34 C.F.R. § 106.45(b)(3)(i). (bold).

(h) "**Provide an equal opportunity for the parties to present witnesses, including fact and expert witnesses, and other inculpatory and exculpatory evidence**." 34 C.F.R. § 106.45(b)(5)(ii). (bold).

(i) "**Not restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence**." 34 C.F.R. § 106.45(b)(5)(ii). (bold).

(j) "**Provide both parties an equal opportunity to inspect and review any evidence** obtained . . . **including the evidence upon which [USU] does not intend to rely . . . and exculpatory evidence**[.]" 34 C.F.R. § 106.45(b)(5)(vi). (brackets, bold).

(k) USU must "**make all" of the evidence available for "the parties' inspection and review . . . to give each party equal opportunity to refer to such evidence during the hearing, including for purposes of cross-examination**." 34 C.F.R. § 106.45(b)(5)(vi). (brackets, bold).    This includes to "each party and the party's advisor . . . the evidence subject to inspection and review in an **electronic format or a hard copy**[.]" *Id.* (bold, brackets).

(l) Create an investigative report that "**fairly summarizes relevant evidence.**" 34 C.F.R. § 106.45(b)(5)(vii). (brackets, bold).

(m) Send that report "to each party and the party's advisor . . . **in an electronic format or a hard copy**[.]" 34 C.F.R. § 106.45(b)(5)(vii). (brackets, bold).

(n) At the live hearing, USU must allow "each party's advisor to ask the other party and any witnesses all relevant questions . . . **including those challenging credibility**." 34 C.F.R. § 106.45(b)(6)(i). (bold).

(o) Retaliation is prohibited: USU must not "**intimidate, threaten, coerce, or discriminate** against any individual . . . **because the individual has . . . participated** . . . in an investigation, proceeding, or hearing[.]" 34 C.F.R. 106.71 (85 FR 30578). (bold).

(p) "**Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations** that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report or complaint of sex discrimination, . . . **for the purpose of interfering with any right or privilege secured by title IX or this part**, constitutes retaliation." 34 C.F.R. 106.71(a) (85 FR 30578). (bold).

64.     Notwithstanding the foregoing Title IX implementation regulations, USU is subject to severe pressure to ensure that it not only complies with Title IX, but that its compliance remains unquestioned. In 2011, the Department issued a "Dear Colleague Letter" which inadvertently had the effect of stripping faculty members of important due process protections and sowing confusion amongst administrators empowered with fulfilling the Title IX grievance procedures. Such remained the 'policy' for six (6) whole years, and was not rescinded until 2017.

65.     Contemporaneous with the Department's rescission of the "Dear Colleague Letter," however, the "Me Too" movement gained exponential momentum. In 2017 news reports of sexual abuse perpetrated by an American film producer, Harvey Weinstein, flooded the public forum.

66.     As a result, the Department was obliged to appease this public sentiment and initiated sweeping investigations of exponentially greater and greater frequency against any and all universities suspected of failing to adequately enforce Title IX against respondents.[1]



67.     As a result, public educational institutions, USU included, remained under severe external pressures to swiftly and severely punish respondents accused of violating Title IX so as to avoid any public scrutiny and the resulting backlash of a Department investigation that could threaten the entirety of USU's federal funding.

68.     As a result of the foregoing external and financial pressures, notwithstanding the Department's rescission of the erroneous 2011 "Dear Colleague Letter," USU continued to foster a policy of treating males unequally so as to secure positive Title IX findings against respondents who overwhelmingly were male.

69.     USU pursues a disproportionate number of Title IX formal complaints raised against males relative to complaints raised against females.

70.     USU allows females to gather evidence supporting their allegations, but forbids males from having the same opportunity.

71.     USU accepts female allegations as true, and presumes males guilty, immediately punishing males by removing them from campus; depriving them of one or more benefits offered by USU; or forbidding the male, and only the male, from discussing with others the allegations raised by a female.

72.     USU knows that females have little to no need to review the 'evidence' gathered against males by USU's Title IX Office of Equity. USU also knows that respondents, who by overwhelming majority are males, have a great need and motivation to review the 'evidence' gathered by USU against them.

73.     USU does not allow the male to have a copy of the evidence.

74.     USU does not allow the male to have a copy of the preliminary report.

75.    USU does not allow the male to have a copy of the final report.

76.    No matter how many documents are involved, no matter how complex or voluminous, the male may only review USU's reports and evidence by way of an online cloud server which restricts the male to viewing one (1) page at a time. The male may not make copies, save, or print the documents that the male is viewing. The male may not even open two (2) pages of the reports or 'evidence' at the same time. The male cannot make notes or commentary upon the reports or evidence to share with his chosen Advisor. And the male's chosen advisor is subject to this same restriction.

77.    As a result, even though males as the accused have a significant need to meaningfully access and review USU's Title IX reports and 'evidence' raised against them, USU's policy is deliberately structured to prevent males from having such access, even when USU itself happens to the be the "claimant" as permitted under Title IX.

78.    USU makes it a practice to biasedly take a female's statement of "sexual discrimination," "sexual harassment," or retaliation at face value. Even when the facts as alleged by the female are incapable of constituting a Title IX violation of sexual discrimination, sexual harassment, or retaliation, the mere fact that a female is willing to call the alleged conduct by such name is sufficient for USU to immediately punish the male, investigate, and twist facts in a manner that belie common sense so as to try and secure a Title IX violation against an accused male.

79.    The compounding effect of the foregoing is intentional discrimination.

80.    USU has developed and implemented its policies and practices in Title IX Grievances so that males, and males alone, are uniquely subject to disparate treatment that severely

impedes and disproportionately and unjustly results in a denial of USU's programs, services, activities, and benefits, regardless of whether the allegations made have merit.

81.    Dr. Liu is a victim of USU's foregoing policy of intentional sexual discrimination against respondents accused of violating Title IX.

82.    STUDENT brought Title IX claims against Dr. Liu. USU and Defendant Seefeldt swiftly punished and removed Dr. Liu, yet in the same breath promptly allowed STUDENT to transfer to an entirely different research group and assured her that she would graduate early in the Spring of 2023.

83.    STUDENT brought Title IX claims against Dr. Liu and was permitted to speak with potential witnesses, berate Dr. Liu, and collect documents or statements from witnesses affiliated with or located on USU.

84.    In contrast, Defendant Seefeldt, and even USU later as a claimant of the alleged allegations, prohibited Dr. Liu from speaking with potential witnesses or collecting documents or statements from witnesses affiliated with or located on USU campus.

85.    USU and Defendant Seefeldt did not so much as allow Dr. Liu to speak with *anyone* affiliated with USU about anything absent Defendant Seefeldt or an assigned member being present and supervising Dr. Liu as if he were a dangerous deviant on parole. If Dr. Liu strayed from these restrictions, as Title IX clearly gave him the right to do, Dr. Liu faced dismissal from employment.

86.    Dr. Liu asked for a copy of Defendant Damelio's preliminary report, and consistent with USU's intentionally discriminatory policy, she refused.

87.     Dr. Liu asked for a copy of Defendant Damelio's final report, and consistent with USU's intentionally discriminatory policy, she refused.

88.     Dr. Liu asked for a copy of the evidence Defendant Damelio had gathered, and consistent with USU's intentionally discriminatory policy, she refused.

89.     Even though STUDENT's Sexual Misconduct formal complaint against Dr. Liu was patently incognizable under Title IX and USU's own policies implementing Title IX, USU, Defendant Seefeldt, and Defendant Damelio continued to punish and subject Dr. Liu to private and public scrutiny for over sixteen (16) months.

90.     The foregoing conduct by Defendants USU, Defendant Seefeldt, and Defendant Damelio would not have occurred absent an affirmative policy within USU to discriminate against males in furtherance of avoiding scrutiny by the public or the Department.

91.     The final report, resulting in a nearly one hundred (100) pages of single-spaced text compiled by Defendant Damelio, placed the evidence Dr. Liu had provided in the footnotes. In many instances throughout the report, Defendant Damelio referred to Dr. Liu and his evidence in a derogatory and demeaning fashion.

92.     Defendants USU, Damelio, and Seefeldt, in violation of Title IX of the Educational Amendments of 1972, discriminated against Dr. Liu because of his sex – a *male* standing accused.

93.     As if the foregoing were not enough, Defendants USU, Smith, and Seamons then proceeded to retaliate against Defenant Liu for his involvement in and contestation of the allegations raised in the Title IX Grievance Proceedings.

94.     Before the Title IX hearing could even occur, USU and Defendant Smith retaliated and issued sanction proceedings for dismissal against Dr. Liu. Defendants stated: "It's improbable

that the many witnesses interviewed at different times in different contexts, were all untruthful in the same way so your denials of wrongdoing lack credibility." At least six (6) times, USU and Defendant Smith expressly reference Dr. Liu's involvement in the Title IX proceedings and engagement in rights bestowed upon him by Title IX as a basis for Defendants' intent to dismiss Dr. Liu's employment.

95.     Tacitly implied throughout the entirety of Defendant Smith's and USU's issuance of sanction proceedings is the apparent disgust that Dr. Liu would have the gall to participate in and contest STUDENT's formal complaints.

96.     Defendant Seamons then conducted her 'investigation' in furtherance of Defendant USU's and Defendant Smith's sanction proceedings. In conducting this investigation, Defendant Seamons repeatedly relied upon the contested and bald allegations of STUDENT; upon Dr. Liu's exercise of his Title IX rights; and upon the biased conclusions of Defendant Damelio's report to conclude that while the allegations standing alone against Dr. Liu may be inconsequential, when accepted and taken as true, they are indicative of a severe and repeated violation of Defendant USU's code of conduct.

97.     Dr. Liu asked for more time to respond to these sanction proceedings, and Defendant Smith denied the request.

98.     Dr. Liu asked to continue the sanction proceeding hearing, and Defendant Smith denied the request.

99.     Defendants USU, Smith, and Seamons engaged in the above conduct with the intent of frustrating Dr. Liu's efforts to prepare for and successfully contend against STUDENT's and USU's Title IX allegations against him.

100.     Defendants USU, Smith, and Seamons engaged in the above conduct with the intent of punishing Dr. Liu for exercising his rights under Title IX and its attending Grievance Process.

101.     When the Title IX Grievance Hearing finally came, Defendant USU's implementation of its intentionally discriminatory policy against males did not end. Dr. Liu challenged STUDENT's credibility, advising the decision-maker that the question posed was designed to address STUDENT's veracity for telling the truth. The decision-maker declared that the STUDENT's credibility was not "relevant" and demanded Dr. Liu to "move on" to his next question.

102.     Dr. Liu also informed the decision-maker that certain factual witnesses were available to testify, had been timely disclosed, and would help to show STUDENT's lack of veracity for telling the truth. The decision-maker declared such evidence was not "relevant" and forbade the witnesses from testifying.

103.     In contrast, STUDENT was repeatedly allowed during the Title IX Grievance Hearing to ask questions directed at impugning Dr. Liu's credibility.

104.     Again, Defendant USU's conduct during the Title IX Grievance Hearing would not have occurred absent an affirmative policy within USU to discriminate against males in furtherance of avoiding scrutiny by the public or the Department.

105.     As a result of Defendant USU's intentional discrimination against Dr. Liu in violation of Title IX, Dr. Liu has been damaged in an amount and quality to be determined at trial.

106.     As a result of Defendant USU's retaliation against Dr. Liu in violation of Title IX, Dr. Liu has been damaged in an amount and quality to be determined at trial.

## SECOND CAUSE OF ACTION
Violation of the Fourteenth Amendment
Due Process
Equal Protection
A 42 U.S.C. § 1983 Cause of Action
(All Defendants)

107.    Plaintiff hereby incorporates by reference each of the preceding paragraphs.

108.    Under the Fourteenth Amendment of the United States Constitution, no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. const., amend. XIV at § 1.

109.    Also under the Fourteenth Amendment of the United States Constitution, "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." *Id*. at § 5.

110.    Under 42 U.S.C. § 1983, Congress enacted the means by which individuals can recover against those who, under the color of state law, violate that individual's federal rights as conferred by the constitution or congress.

111.    Defendants violated Dr. Liu's constitutional right to procedural due process as embodied in the principle of fundamental fairness.

112.    The Department seeks to maintain fundamental fairness within the Title IX grievance process, and so requires a university to provide any respondent with "written notice" of the "allegations of sexual harassment potentially constituting sexual harassment as defined in § 106.30, including sufficient details known at the time and with sufficient time to prepare a response before any initial interview[.]" 34 C.F.R. § 106.45(b)(2)(i)(B). (brackets).

113.    Similarly, the Department requires that if the university "decides to investigate allegations . . . that are not included in the notice" then the university must "provide notice of the additional allegations to the parties[.]" 34 C.F.R. § 106.45(b)(2)(ii). (brackets).

114.    But constitutional rights of due process and fundamental fairness both predate and transcend Title IX, and would still exist with or without the Department's efforts to maintain these rights.

115.    Contrary to Dr. Liu's rights of fundamental fairness and procedural due process, Defendants did the following:

     a.   Defendants USU and Damelio failed to provide meaningful access to evidence collected by USU;

     b.   Defendants USU, Seefeldt and Damelio forbade Dr. Liu from collecting evidence;

     c.   Defendants USU, Seefeldt and Damelio forbade Dr. Liu from speaking with others;

     d.   Defendant USU forbade Dr. Liu from confronting the STUDENT's credibility;

     e.   Defendant USU and Damelio failed to make an initial assessment and dismiss the STUDENT's incognizable allegations of Sexual Misconduct;

     f.   Defendant USU and Damelio failed to provide Dr. Liu with notice of the reasons for extensions being granted;

     g.   Defendant USU and Damelio failed to complete the Title IX grievance process within a reasonable amount of time; and

h.  Defendant USU and Damelio failed to provide fair notice to Dr. Liu of the Title IX violations alleged to have been violated.

116.  Defendant also violated Dr. Liu's constitutional right to substantive due process. Like procedural due process, the Department seeks to ensure that substantive due process is maintained throughout the Title IX grievance proceedings.

117.  Wherefore, the Department requires that universities presume that every respondent is "not responsible for the alleged conduct until a determination regarding responsibility is made at the conclusion of the grievance process." 34 C.F.R. § 106.45(b)(1)(iv).

118.  However, the constitutional right of substantive due process both predates and transcends Title IX, and that right exists and will continue to exist irrespective of the Department's efforts.

119.  In violation of Dr. Liu's substantive due process rights as guaranteed to him under the Fourteenth Amendment of the United States Constitution, before any Title IX grievance hearing could even be held, Defendants took away Dr. Liu's liberty to use his teaching license and exercise those professional privileges granted to him as a professor tenured by a public institution; removed Dr. Liu from his position; and forbade Dr. Liu from speaking with others as guaranteed to him by his First Amendment Right under the United States Constitution. Specifically, Defendants did the following:

a.  Defendants USU, Seefeldt and Smith punished Dr. Liu, removing him from campus, removing his professorial duties and privileges, and removing his faculty profile from USU's website all before any finding had been made in the

Title IX Grievance Proceedings and before Dr. Liu had even had the opportunity to be heard in the Title IX Grievance Proceedings.

b.  Defendant Seamons recommended in an official report that Dr. Liu be disciplined up to and including termination as a result of Defendant Damelio's biased findings and STUDENT's bald allegations before Dr. Liu even had the chance to contest those biased findings and bald allegations.

120.    Defendants USU, Damelio, Smith and Seamons also initiated and pursued and did discipline Dr. Liu because he expressed to students within his research group that he disagreed with the manner in which USU was implementing the Title IX grievance process. Thus, in addition to preemptively stripping Dr. Liu of his state-granted rights as a tenured professor, and right to access USU's public facilities, and right to engage in the Title IX grievance process, these same Defendants preemptively stripped Dr. Liu of his First Amendment Right to free speech and assembly in furtherance of speaking out against the wrongful acts of a public entity.

121.    The right of free speech is a long held and even bedrock liberty of the United States of America, but Defendants used the Title IX grievance process as a means to silence and deprive Dr. Liu of that right before a hearing could even be held.

122.    Defendants also violated Dr. Liu's constitutional right to equal protection. The Department seeks also to maintain equal protection within the Title IX grievance process, requiring universities to apply their procedures "equally to both parties." 34 C.F.R. § 106.45(b).

123.    The constitutional right of equal protection, however, predates and transcends Title IX and will continue to exist notwithstanding the Department's efforts.

124.    Contrary to the right of equal protection, Defendants did as follows:

a. Defendants USU, Seefeldt, Damelio, and Smith forbade and disciplined Dr. Liu for speaking with individuals affiliated with USU, but placed no similar restriction or discipline upon STUDENT or USU.

b. Defendants USU, Seefeldt, Damelio, and Smith forbade and disciplined Dr. Liu for collecting statements or documents from individuals affiliated with USU, but placed no similar restriction or discipline upon STUDENT or USU.

c. Defendants USU, Seefeldt, Damelio, and Smith forbade and disciplined Dr. Liu should he come upon campus grounds, but placed no similar restriction or threat of discipline upon STUDENT or USU.

d. Defendants USU, Seefeledt, and Smith forbade Dr. Liu from having a copy of the evidence, but imposed no similar restriction upon USU as a claimant of the amended allegation of Sexual Misconduct.

e. Defendants USU, Seefeldt, and Smith forbade Dr. Liu from having a copy of the reports, but imposed no similar restriction upon USU as a claimant of the amended allegation of Sexual Misconduct.

125.   As a result of Defendants' violations of Dr. Liu's constitutional rights to procedural due process, substantiative due process, and equal protection as secured to Dr. Liu under the Fourteenth Amendment of the United States Constitution, Dr. Liu has been damaged in an amount and quality to be proven at trial.

**THIRD CAUSE OF ACTION**
Violation of Fifth and Fourteenth Amendments
A 42 U.S.C. § 1983 Cause of Action
(Or Breach of Implied-in-Fact Contract in the Alternative)
(Defendants Utah State University and Damelio)

126.     Plaintiff hereby incorporates by reference each of the proceeding paragraphs.

127.     Under the Fifth Amendment of the United States Constitution, no person shall be twice put in jeopardy for the same offense. U.S. const., amend. V.

128.     By virtue of the Fourteenth Amendment of the United States Constitution, the rights guaranteed to citizens under the Fifth Amendment are imputed to the States.

129.     Under 42 U.S.C. § 1983, Congress enacted the means by which individuals can recover against those who, under the color of state law, violate that individual's federal rights as conferred by the constitution or congress.

130.     USU also maintains policies and procedures which are treated by both USU and its faculty as a contract. Thus, by virtue of these policies and procedures, there exists a contract, implied in fact, which contract is substantiated vis-à-vis USU's policies and procedures.

131.     Under USU's policies and procedures, USU promises not to subject faculty to "double jeopardy" for the same allegedly offending misconduct.

132.     When USU brought its amended claim against Dr. Liu, it did so on its behalf of USU, not STUDENT. When USU brought its amended claim against Dr. Liu, STUDENT had graduated, was no longer at USU, had withdrawn from the Title IX process, and had asked USU to dismiss her claims against Dr. Liu.

133.     When USU brought its amended claim against Dr. Liu, it did so on the heels of dismissing STUDENT's Discrimination formal complaint on the merits. However, contrary to the

notice set forth in USU's amended claim, USU's Title IX grievance hearing decision-maker informed Dr. Liu that the gravamen issue to be determined at the Title IX grievance hearing was whether or not Dr. Liu had treated STUDENT differently because of her sex.

134.    As a result, contrary Dr. Liu's right against double jeopardy as secured to him through the Fifth and Fourteenth Amendments, and contrary to USU's implied-in-fact contract to not expose Dr. Liu to double jeopardy for the same alleged offense, Dr. Liu was forced to face and contest the same offense twice.

135.    As a result of Defendants USU's and Damelio's violation of Dr. Liu's constitutional right against double jeopardy, or alternatively as a result of Defendant USU's breach of its implied in fact contract not to expose Dr. Liu to double jeopardy, Dr. Liu has been damaged in an amount and quality to be proven at trial.

<u>**FOURTH CAUSE OF ACTION**</u>
Declaratory Relief – Injunctive
(Defendants Utah State University, Seefeldt, and Smith)

136.    Plaintiff hereby incorporates by reference each of the proceeding paragraphs.

137.    Federal Courts are empowered to enter declaratory relief, as well as relief in the form of affirmative or injunctive relief. See 28 U.S.C. §§ 2201 and 2202.

138.    In violation of Title IX of the Educational Amendments of 1972, Defendants have discriminated against Dr. Liu because of his sex.

139.    In violation of Title IX of the Educational Amendments of 1972, Defendants have retaliated against Dr. Liu because of his participation in the Title IX grievance process.

140.    In violation of the Fourteenth Amendment of the United States Constitution, Defendants have violated Dr. Liu's procedural due process and substantive due process rights.

141.    In violation of the Fifth Amendment as imputed to the States by the Fourteenth Amendment, and in violation of USU's implied-in-fact contract with Dr. Liu, Defendants have subjected Dr. Liu to double jeopardy.

142.    Based upon the foregoing, the Court should enter an order enjoining Defendants from subjecting Dr. Liu to further Title IX grievance procedures.

143.    Based upon the foregoing, the Court should enter an order enjoining Defendants from subjecting Dr. Liu to any further employment sanction proceedings.

144.    Based upon the foregoing, the Court should order Defendant Utah State University to reinstate Dr. Liu with all rights, privileges, and liberties entitled to him as a licensed and Tenured Associate Professor of the Utah State University.

145.    Based upon the foregoing, the Court should order Defendants not to in any way prohibit Dr. Liu from speaking or writing about, or assembling with others regarding Defendants' lack of compliance with Title IX; Defendants' discrimination or retaliation against Dr. Liu; Defendants' denial of equal protection to Dr. Liu; or Defendant Utah State University's breach of its implied-in-fact contract with Dr. Liu.

## **DEMAND**

146.    Plaintiff demands a Trial by Jury of his peers.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff as follows:

a.      Declaratory relief as set forth, *supra*;

b.      Special, general, punitive, or other damages in an amount and quality to be determined by the Jury at trial;

c.      Costs and reasonable attorney's fees; and

d.      Prejudgment and Post-Judgment interest.

DATED this 23rd day of May, 2024.

BEARNSON & CALDWELL


*/s/ Aaron K. Bergman*
Aaron K. Bergman
*Attorneys for Plaintiff*